### MURPHY v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Third Department. January 4, 1905.)

CARRIERS—INJURIES TO TRESPASSER—SUFFICIENCY OF EVIDENCE.

In an action against a railroad company by a trespasser on a train for injuries, plaintiff's evidence that he was kicked from the train by one of defendant's brakemen *held* insufficient to establish that fact as against the positive evidence of every person connected with the operation of the train at the time of the injury, the most of which was undisputed.

Appeal from Trial Term, Albany County.

Action for personal injuries by Edward Johnson against the New York Central & Hudson River Railroad Company. From a judgment for plaintiff on a verdict of $4,500, and from an order denying a new trial, defendant appealed. After the appeal was taken, plaintiff died, and the action was continued in the name of Joseph A. Murphy as executor. Reversed.

Argued before PARKER, P. J., and SMITH, CHASE, CHESTER, and HOUGHTON, JJ.

Harris & Rudd, for appellant.

Joseph A. Murphy, pro se.

CHESTER, J. The action was one brought to recover damages for personal injuries sustained by the testator, Edward Johnson, who claimed that he was kicked from the platform of one of defendant's cars on passenger train No. 37 by a trainman employed by the defendant, in such a way that, after reaching the ground, his left arm was run over by the train on which he was riding, and so badly crushed that it had to be amputated. Johnson was stealing a ride to Rochester upon the train in question, having boarded it, as he claims, in the city of New York, and having ridden from that point upon the front platform of the baggage car to the railroad yard in the city of Rensselaer, where his injuries were received.

While the evidence in this case presented a question of fact for submission to the jury in the first instance, because of the conflict between the testimony of Johnson and of the defendant's witnesses as to the main features of Johnson's story (McDonald v. Met. St. Ry., 167 N. Y. 66, 60 N. E. 282), yet the verdict in favor of Johnson was so clearly against the great weight and preponderance of the evidence that we think it cannot stand. Johnson had no corroboration of the essential features of his story. After describing how he managed to get upon the train in New York at 9 o'clock on the night of the 23d day of March, 1900, and his riding upon the front end of the third car back from the engine on that train "a long ways," he testified with reference to the manner of his injury, in substance, that he came to a place where the train "slowed down," and a brakeman got off the train, and went ahead on the right-hand side, going west; that the brakeman on his way back saw him sitting in the doorway, and jumped up on the steps, and said: "What * * * are you doing on here? Get off here;" and kicked him on the right side, and he slid down the steps to the ground on the left side of the train, and his arm went under the wheel, and that the

man went on with the train.   Johnson was found, immediately after the train passed, on the ground on the right side of the track over which the train passed, and about 50 feet south of the Herrick Street Bridge in the railroad yard in Rensselaer.   He was afterwards taken to the hospital, where his left arm was amputated.   The case has been tried three times.   Upon the first trial the plaintiff had a verdict, and the judgment entered thereon was reversed by the Court of Appeals. 173 N. Y. 79, 65 N. E. 946.   Upon the second trial the plaintiff again had a verdict, which was set aside by the justice holding the term, as against the weight of evidence.   40 Misc. Rep. 350, 82 N. Y. Supp. 254. On the third trial the plaintiff again had a verdict, and from a judgment entered thereon this appeal is taken.

On the first trial Johnson failed to identify the man who kicked him off the train, but he said he was a man with a sandy complexion, and had a sandy moustache.   The Court of Appeals reversed the judgment procured on that trial on the ground that there was no evidence upon which the jury could find that any of the defendant's servants assaulted the plaintiff.   On the second trial, after Johnson knew that under the decision of the Court of Appeals it was essential for him to identify the man who put him off, he named Shultis, the rear brakeman of the train, as the man.   Shultis was not a man of sandy complexion, or wearing a sandy moustache, but was a man having curly black hair and a black moustache.   He was present in court four days during the first trial, but was not then identified by Johnson.   He was sworn upon all the trials, and testified on the last trial that his hair and complexion were the same in March, 1900, as they were when Johnson identified him as the man.   Johnson's identification of Shultis after so long a delay, and under such circumstances, is far from satisfactory, and his testimony relating thereto is entitled to little, if any, weight.   It was also clearly proven that there was no trainman on train 37 bearing the description given by Johnson on the first trial.   The crew of that train consisted of a conductor, engineer, fireman, baggageman, forward trainman, rear trainman, and an American Express Company's messenger. All these men testified in behalf of the defendant.   Every one of them connected with the operation of the train, besides every man employed by the defendant in the railroad yard who saw the train pass, testified clearly that the train did not slow down as it went through the yard. Most of these witnesses gave their estimate of the speed of the train as it passsed through the yard.   While these were simply estimates or opinions of the speed, yet they were given by men competent to make such estimates and to give such opinions.   The estimates of the several witnesses naturally differed quite materially from each other, but they were based upon observations from different points of view, and it is not strange that they varied from 12 or 15 to 40 miles an hour.   This is rather in favor of the truthfulness of the testimony than against it. These estimates were supplemented, however, by the evidence of the witness Barrett, which showed the exact speed of the train as it passed the Herrick Street Bridge, near which Johnson was injured, and which bridge is between towers 98 and 99 in the Rensselaer yard.   Barrett was in charge of tower 98 on the night in question, and testified that it was his duty to throw and receive electric signals from the towers next

north and south of his, and to keep a record of all trains passing both north and south, and that he made a record of the passing of train 37 that night. That record, which he testified he correctly made at the time, was produced, and it showed that the rear end of that train passed tower 98 at 1:38 a. m., and tower 99, the one next north, according to the signal received from that tower by him, at 1:39 a. m. The distance between towers 98 and 99 is 3,075 feet. Having passed that distance in one minute, a computation shows the speed of the train to have been over 34 miles an hour. Against all this evidence is the bare statement of Johnson that the train "slowed down" at the place in question. If the train was going even at the lowest rate of speed given by any of these witnesses, it is clear that it would have been impossible for a trainman to have gotten off from the train, and to have run ahead of the place where Johnson was seated on the third car from the engine, and on his way back to have boarded the train and kicked Johnson off, as testified to by the latter. Shultis denied that he got off the train at Rensselaer, and that he kicked Johnson from the train, or that he even knew that he was on the train, and each of the train crew denied any knowledge of Johnson being on the train. Shultis was the rear brakeman. His duty confined him to the rear coach of the train when in motion, and it was clearly proven that when the train reached the Albany yard he was at his place of duty. This also disputes Johnson where he said that the man who kicked him from the train remained on the platform from which he was kicked. That was at the front of the baggage car, the door of which was closed by baggage being piled against it on the inside, and at the rear of one of the express cars, the door of which was also closed by express material being piled against it on the inside; so that it would have been impossible for Shultis to have passed from that platform to the rear coach of the train and be where he was when the train arrived in the yard at Albany. To have arrived at the verdict in favor of Johnson the jury must have rejected practically the entire mass of evidence of a large number of witnesses simply because they were employés of the defendant, only one of whom could have any possible interest in the result, and to have taken as true the meager evidence of Johnson, which in many ways other than his interest in the result was shown to be unworthy of credit. While it was proper to give the fact that the defendant's witnesses were in its employ such consideration as it was entitled to in weighing their testimony, the sweeping rejection of practically their entire testimony, much of which was entirely undisputed, was unwarranted. Johnson v. N. Y. C. & H. R. R. Co., 173 N. Y. 83, 65 N. E. 946. The verdict is so clearly against the great weight of the evidence as to show either that the jury wholly misapprehended the evidence, or that they were influenced by passion or prejudice in rendering it as they did, and it must therefore be set aside.

The judgment should be reversed on the law and on the facts, with costs to the defendant. All concur.

CHASE, J. I voted to affirm the judgment obtained by the plaintiff's intestate on the first trial of this action (Johnson v. N. Y. C. & H. R. R. Co., 66 App. Div. 617, 73 N. Y. Supp. 1137), but on the last

trial the record shows that the weight of evidence offered on behalf of the defendant, particularly that relating to the speed of the train at the place where the accident occurred, is much greater than such evidence as presented by the defendant on the first trial, and I concur in the opinion for reversal.